ADMANCO, Inc. by Michael S. Polsky, Receiver,
Plaintiff-Respondent,

v.

700 Stanton Drive, LLC,
Defendant-Appellant,†

M&I Marshall & Ilsley Bank, EBSCO Industries,
Inc. and Alliance Laundry Systems, Inc.,
Garnishees.

Court of Appeals

*No. 2007AP2791. Submitted on briefs August 28, 2008.
—Decided April 15, 2009.*

2009 WI App 57

(Also reported in 768 N.W.2d 32.)

† Petition to review granted 9/10/09. Abrahamson, C.J., and
Ziegler, J., did not participate.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Valerie L. Bailey-Rihn* and *Matthew D. Fortney* of *Quarles & Brady LLP*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Matthew S. Vignali* and *Kevin L. Keeler* of *Beck, Chaet, Bamberger & Polsky, S.C.*, Milwaukee.

Before Brown, C.J., Anderson, P.J., and Neubauer, J.

¶ 1. NEUBAUER, J. 700 Stanton Drive, LLC, appeals from a summary judgment granted in favor of Admanco, Inc., by its Receiver, Michael S. Polsky. Admanco is in a WIS. STAT. ch. 128 (2007–08)[1] receivership proceeding. Admanco had a fifteen-year lease for property rented from Stanton. After Admanco entered into receivership, Stanton, claiming that it is entitled to recover damages for the entire fifteen-year lease period, withdrew funds under two irrevocable standby letters of credit issued by M&I Bank, which were held by Stanton as a security deposit. In related reimbursement agreements with M&I, Admanco pledged its assets to secure the letters of credit. WISCONSIN STAT. § 128.17(2) limits a landlord's recovery in a ch. 128 proceeding. Stanton contends that the statute does not limit its claim because (1) Admanco rejected the lease by filing for receivership, and in any event, it is entitled to lease damages outside the receivership proceeding because

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

(2) Stanton is a secured creditor, and (3) the proceeds from the letters of credit are not property of the estate. We disagree and conclude that the § 128.17(2) limit applies to this landlord whose tenant entered into a ch. 128 proceeding. As such, we affirm the circuit court's judgment requiring Stanton to reimburse Admanco's estate for the funds withdrawn which depleted the assets of the receivership estate over and above the landlord's allowable claim under § 128.17(2).

## FACTS AND PROCEDURAL HISTORY

¶ 2. The facts underlying the dispositive issues on appeal are undisputed. Admanco was a tenant under a "Net Industrial Building Lease" dated March 31, 2004, for a property located at 700 Stanton Street in Ripon, Wisconsin. 700 Stanton Drive, LLC ("Stanton"), owned the property and was the landlord under the lease, which was for a fifteen-year term. Pursuant to the lease, Admanco provided Stanton with a security deposit in the amount of $61,313.66, and an irrevocable standby letter of credit in the amount of $375,000. Admanco's guarantors under the lease, Christopher Bumby, Edward Bumby, and the Elizabeth A. Bumby Marital Trust, provided a second letter of credit in the amount of $375,000.[2]

---

[2] The proceeds of the letter of credit provided by the Bumby guarantors were initially a subject of this lawsuit. However, the Receiver later reached a stipulation with the guarantors in which the Receiver received $267,364.17. That settlement was approved by the receivership court on March 30, 2006. The circuit court reduced the Receiver's claim against Stanton to the letter of credit proceeds by that amount, and the Receiver has not challenged that reduction. Thus, at issue here is only the remaining amount of $107,635.83 in proceeds from the letter of

¶ 3. On December 30, 2004, Admanco filed an Assignment for the Benefit of Creditors pursuant to WIS. STAT. ch. 128.[3] That same day, the court in the receivership proceeding entered an order under ch. 128 appointing Michael S. Polsky as the receiver over all assets of Admanco. The court's December 30 order additionally enjoined creditors from proceeding against Admanco, "the assignor."[4]

¶ 4. Polsky, as Receiver, then remained in possession of the leased premises until Admanco's assets were sold in January 2005 at which time the purchaser of Admanco's assets, EBSCO Industries, Inc., occupied the premises.[5] EBSCO later entered into a written lease with Stanton commencing April 1, 2005.

¶ 5. However, during the initial stages of the receivership proceeding, Admanco failed to make its January 1, 2005 rent payment as required under the lease. Stanton provided Admanco with the requisite notice and opportunity to cure, which Admanco failed to do. On January 10, 2005, shortly after Admanco filed for an assignment, Stanton drew down both letters of

credit that, in related agreements, the Bumbys secured with Admanco's assets, and whether that amount is recoverable by the estate.

[3] This proceeding is pending as *In re Admanco, Inc., Assignor*, Case No. 04–CV-775.

[4] The court ordered "[t]hat all creditors of Assignor are hereby enjoined and restrained from (a) commencing in any action or prosecuting any other action now pending other than in these proceedings, (b) enforcing against Assignor or its property any judgment; and (c) taking any action to collect or recover a claim against Assignor."

[5] Pursuant to the asset purchase agreement, EBSCO agreed to pay the rent and related occupancy costs to Stanton for at least ninety days after the closing.

credit in the amount of $750,000 and also retained Admanco's security deposit in the amount of $61,313.66. The issuer of the letters of credit, M&I Bank, was reimbursed the $750,000 for the letters of credit from the sale of Admanco's assets to EBSCO.

¶ 6. On December 11, 2006, the Receiver filed this action pursuant to Wis. Stat. § 128.19(1)(c)[6] to recover excess lease payments from Stanton. The Receiver alleged that Admanco had paid all base rent due under its lease with Stanton through December 30, 2004, the date it filed for receivership. The Receiver additionally alleged that it had paid Stanton for the lease payments due after the filing date up until the commencement of the lease with EBSCO and that Stanton had terminated the lease by drawing down the letters of credit. As such, the Receiver claimed that it was entitled to "$811,313.66, less any unpaid amounts that Stanton can prove that it is owed for rent due for the period prior to April 1, 2005."

¶ 7. In response to the Receiver's claims, Stanton alleged that it had drawn on the letters of credit after Admanco's "default, notice and an opportunity to cure." Among other affirmative defenses raised, Stanton denied that it had terminated the lease. Stanton requested dismissal of the action and an award for damages and attorney fees as provided for in the lease.

¶ 8. Both parties later moved for summary judgment. After a hearing on October 29, 2007, the circuit

---

[6] Wisconsin Stat. § 128.19(1)(c) provides:

The receiver or assignee upon qualifying shall be vested by operation of law with the title of the debtor as of the date of the filing of the petition or assignment hereunder, except so far as it is property which is exempt, including . . . [r]ights of action arising upon contracts or from the unlawful taking or detention of or injury to the debtor's property.

court entered judgment in favor of the Receiver in the amount of $513,292.66 plus statutory costs and fees.[7] In doing so, the circuit court focused on the application of the receivership statutes under WIS. STAT. ch. 128, specifically § 128.17(2), in determining that the landlord's claim was limited to past due rent and payment at the rate specified in the lease for the one-month period of occupancy by the Receiver in January 2005. Stanton appeals.

## DISCUSSION

### *Standard of Review*

■

¶ 9. Summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08. The grant or denial of a motion for summary judgment is a matter of law that this court reviews de novo. *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 536, 563 N.W.2d 472 (1997). As such, we review a summary judgment without deference to the circuit court, but benefiting from its analysis. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 314–15, 401 N.W.2d 816 (1987).

■

¶ 10. The issues in this case center on the application of certain provisions of WIS. STAT. ch. 128, which governs creditors' actions. Specifically at issue on ap-

---

[7] This amount represents the letter of credit proceeds ($750,000) and security deposit ($61,313.66), less the $267,364.17 received by the receiver from the Bumbys and the $30,656.83 administrative rent claim, plus prejudgment interest at the statutory rate.

peal is whether Stanton's interests are limited to those of a landlord under WIS. STAT. § 128.17(2), or whether Stanton is a secured creditor under WIS. STAT. § 128.25(1)(e) and thus entitled to retain the proceeds of the letters of credit outside the receivership proceeding. *See Wisconsin Brick & Block Corp. v. Vogel*, 54 Wis. 2d 321, 326, 195 N.W.2d 664 (1972) ("A secured creditor under ch. 128 cannot have his security taken away from him without his consent.") The interpretation of a statute presents a question of law that we review de novo. *Pluskota v. Roadrunner Freight Sys., Inc.*, 188 Wis. 2d 288, 293, 524 N.W.2d 904 (Ct. App. 1994). We address each argument in turn.

*The Limitation of Landlord Claims under*
*WIS. STAT. § 128.17(2)*

¶ 11. WISCONSIN STAT. § 128.17 governs the order of distribution of assets from the debtor's estate. With respect to a landlord's claim for rent and/or damages, § 128.17(2) provides:

> Debts to become due as well as debts due may be proved, but a lessor's claim shall be limited to past due rent, and to any actual damage caused the lessor by a rejection of the lease on the part of the debtor or by its termination by force of its provisions. The lessor shall be entitled to payment in full, at the rate specified in the lease, for the period of any actual occupancy by the receiver or assignee.

WISCONSIN STAT. ch. 128 is modeled after certain provisions of the federal Bankruptcy Act of 1893 and 1898. *Capitol Indem. Corp. v. Hoppe (In re Bossell, Van Vechten & Chapman)*, 30 Wis. 2d 20, 26, 139 N.W.2d 639 (1966) ("[Chapter 128] was enacted in 1937 and in a large measure was copied from or based upon the

National Bankruptcy Act as it then read or as it was originally created in 1893.") As originally enacted, prior to 1934, the Bankruptcy Act was silent as to the provability of claims for rent to accrue in the future, however, courts were "virtually unanimous in deciding that rent destined to accrue after the filing of a petition was not capable of proof, since there was no fixed liability absolutely owing, but merely a demand contingent upon uncertain events." *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 918 (2nd Cir. 1944) (collecting cases).

¶ 12. The limitation on landlord claims recognized both the main object of the Bankruptcy Act and the difference between a landlord-creditor and a general creditor. *Id.* at 920 & n.9. That is, the purpose of the Bankruptcy Act was to afford a means of rehabilitation to an honest bankrupt through a discharge of debts, and this purpose would be thwarted by the nondischargeable nature of large rent claims. *Id.* at 920. Moreover, the landlord, unlike other general creditors, would be compensated up until the date of the bankruptcy petition and was able to regain its original asset upon bankruptcy. Additionally, it was recognized that the unexpired term in no way really benefited the bankrupt's estate. *Id.*

¶ 13. As explained in *Oldden*, in 1934, Congress amended the Bankruptcy Act to overcome obstacles that previously prevented landlords from proving claims for future rent. *Id.* In a compromise, Congress made claims for future rents provable but placed a ceiling on the measure of a landlord's damages to avoid large and overwhelming claims for unearned rent.[8] *Id.*

---

[8] As explained in *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 917 (2nd Cir. 1944), the 1934 amendment to the Bank-

at 920, 920 n.10. The landlord limit under the federal bankruptcy act was later amended to adopt 11 U.S.C. § 502(b)(6)(A), which allows landlords to prove "the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease." The parties agree that the Wisconsin provisions were not amended to allow limited future damages, but rather retained the original pre-1934 limitation to past rent due.[9]

*I. WISCONSIN STAT. § 128.17(2) Limits Stanton to Payment for the One-Month Period of Actual Occupancy by the Receiver.*

██

¶ 14. At the time of the assignment for the benefit of creditors, Admanco was current on its rent obligation. WISCONSIN STAT. § 128.17(2) requires payment to the landlord for post-filing rent for the period of the

ruptcy Act, then titled § 63 sub. a(9), provided for one year's rent following the surrender of the premises and any past due rent.

[9] The current landlord cap is set forth in the Bankruptcy Code, in 11 U.S.C. § 502(b)(6). Section 502(b)(6) provides that a landlord's claim is not allowed to the extent it exceeds

> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—(i) the date of the filing of the petition; and (ii) the date on which such lessor repossessed, or the lessee surrendered, the lease property; plus

> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

receiver's actual occupancy only.[10] The parties agree that Stanton is entitled to $30,686.53 as payment in full for the one-month period it occupied the premises in January 2005. Beyond that, Stanton contends that Admanco rejected the lease when it entered into receivership and, thus, Stanton is entitled to actual damages under § 128.17(2).[11] However, Admanco did not reject the lease prior to filing for receivership under WIS. STAT. ch. 128, and the filing itself does not does not constitute a "rejection."

¶ 15. WISCONSIN STAT. § 128.17(2) provides that, in addition to past due rent and rent for actual occupancy by the receiver, a landlord is entitled to recover "any actual damage caused . . . by a rejection of the lease on the part of the debtor." In support of its argument that Admanco rejected the lease, Stanton cites to the definition of repudiation, as cross-referenced with "rejection" in BLACK'S LAW DICTIONARY, 1291, 1306 (7th ed. 1999) (refusal to perform a duty or obligation owed another party). However, at the time of filing, Admanco had not refused to perform any duty or obligation under the lease. We agree with the Receiver that it would be unreasonable to construe a filing under WIS. STAT. ch. 128 as a "rejection" of a lease under § 128.17(2). If that were the case, every landlord would be entitled to actual damages under the lease and the limiting language of § 128.17(2) would be rendered superfluous. *See Koll-*

---

[10] *See also Floerscheimer v. Cousins (In re Citizens' Savings & Trust Co.),* 171 Wis. 601, 177 N.W. 905 (1920).

[11] We note that WIS. STAT. § 128.17(2) additionally permits actual damages if the lease was terminated by the force of its provisions. While Stanton develops an argument as to rejection, it does not do so as to actual damages under subsection (2) arising from termination under its lease provisions. We therefore limit our discussion to the issue of rejection.

244

*asch v. Adamany*, 104 Wis. 2d 552, 563, 313 N.W.2d 47 (1981) ("When construing statutes, meaning should be given to every word, clause and sentence in the statute, and a construction which would make part of the statute superfluous should be avoided wherever possible."). In short, if every assignment for the benefit of creditors causes a rejection of a lease, presumably the statute would have simply said that.

██

¶ 16. Further, at the time of filing, a receiver is vested with the debtor's title to property and rights under contract, including the debtor's rights and interest as a tenant under a lease. *See* Wis. Stat. § 128.19(1)(c). This is evidenced by the facts of this case. After Admanco filed for receivership under Wis. Stat. ch. 128, the Receiver retained control over the lease and negotiated with EBSCO for its occupancy of leased premises. If Stanton were correct and Admanco had rejected the lease by filing for receivership, title would not have transferred to the Receiver and he would not have been in a position to occupy it for one month or continue negotiating under it. We reject Stanton's contention that Admanco rejected the lease by filing for receivership.

*II. Stanton's Claim to Retain the Security Deposit and the Proceeds of the Letters of Credit "Outside" the Receivership Fails.*

██ ██

¶ 17. As discussed earlier, Stanton acknowledges that Wis. Stat. ch. 128 does not allow a landlord to have a provable claim for future rent. Nevertheless, Stanton argues, under the 1898 Bankruptcy Act, a landlord's claims were not discharged in the bankruptcy proceed-

ing and remained valid as they became due and owing. *See Oldden*, 143 F.2d at 919–20. Similarly, ch. 128 does not provide for the discharge of debts. *Gelatt v. DeDakis (In re Mader's Store for Men, Inc.)*, 77 Wis. 2d 578, 593, 254 N.W.2d 171 (1977). However, as the Receiver points out, under the 1898 Bankruptcy Act, where a tenant's assets were liquidated, the landlord's right to future rent from a bankrupt tenant as it accrued was effectively "valueless" because "all the assets wherewith [the tenant] might pay were taken from him." *City Bank Farmers Trust Co. v. Irving Trust Co.*, 299 U.S. 433, 441 (1937) (explaining the practical implications of the Bankruptcy Act prior to 1934).

¶ 18. Seeking to avoid that result, Stanton argues that it is a secured creditor under WIS. STAT. ch. 128, and thus, it can look to its secured collateral—the proceeds from the letters of credit—as payment for its damages regardless of the limitations under WIS. STAT. § 128.17(2).[12] In other words, Stanton contends that, as a secured creditor, it is entitled to retain the proceeds of the letters of credit to collect the future rent as it becomes due and owing pursuant to the terms of the lease. It thus contends that its lease claim falls outside the receivership—outside the statutory limit.

*A. Stanton Is Not a Secured Creditor Under WIS. STAT. § 128.25(1)(e).*

¶ 19. WISCONSIN STAT. § 128.25(1)(e) defines a "secured creditor" as a

---

[12] Stanton argues that under various provisions (WIS. STAT. §§ 128.15(2), 128.25(4) and (5)), its claim as a secured creditor falls outside the receivership proceeding. Based on our determination that Stanton is not a secured creditor, we need not address this argument. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issues need be addressed).

creditor who has either legal or equitable security for his or her debt upon any property of the insolvent debtor of a nature to be liquidated and distributed in a liquidation proceeding, or a creditor to whom is owed a debt for which such security is possessed by some endorser, surety, or other person secondarily liable.

With respect to the letters of credit, Stanton argues that "Admanco owed rental obligations to Stanton, and M&I (the person secondarily liable to Stanton) had a security interest on all of Admanco's assets to secure Admanco's obligations to Stanton." Stanton's argument overlooks the independent nature of the relationships which exist between the three parties: Admanco and M&I, Admanco and Stanton, and M&I and Stanton. Namely, M&I, as the issuer of a standby letter of credit, was not "secondarily liable" for Admanco's contractual obligations with Stanton.

¶ 20. The rights and obligations of an issuer of a letter of credit[13] are set forth under WIS. STAT. § 405.103(4):

---

[13] A standby letter of credit, like a security deposit, provides assurance for the performance of an obligation. A letter of credit provides for payment by a third party to one party to a contract when the other contracting party fails to perform its obligation. There are typically three parties to a letter of credit: the issuer (usually a bank), the applicant (the tenant, for present purposes), and the beneficiary (the landlord). The tenant pays the bank a fee and provides a reimbursement agreement for the bank to issue the letter of credit for the landlords benefit. If the tenant defaults on his [or her] obligations under the lease, the landlord may draw upon the letter of credit, i.e., request payment, and the bank is obligated to pay the landlord.

Joshua E. Luber, Comment, *Letters of Credit and 11 U.S.C. § 502(b)(6): The Full Analysis—Why the Fifth Circuit's Deci-*

> Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.

Applying this "independence principle," the letter of credit gave rise to a primary independent obligation of M&I to Stanton, and not that of a guarantor or one who is secondarily liable for Admanco's obligations.

¶ 21. Courts and commentators alike universally agree that the letter of credit is an independent primary obligation which cannot give rise to the rights and defenses of a guarantor, or an entity that is secondarily liable. *See, e.g.,* 3 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE sec. 26–2 (5th ed.) ("To say that a letter is a guaranty . . . is to make an inaccurate statement about the letter of credit transaction."); *Pastor v. Nat'l Republic Bank,* 390 N.E.2d 894, 897 (Ill. 1979) ("Although the use of letters of credit is often referred to as being in the nature of a guaranty or suretyship arrangement, it does not assume the legal significance of either.") As explained by the Seventh Circuit Court of Appeals in *Bank of North Carolina, N.A. v. Rock Island Bank,* 570 F.2d 202, 206 n.7 (7th Cir. 1978):

> Unlike the true contract of guaranty, however, the guaranty [standby] letter of credit will oblige its issuer

---

*sion In In re Stonebridge Is Only Part of the Answer,* 22 EMORY BANKR. DEV. J. 679, 680 (2006) (footnotes omitted). The Wisconsin statutes define a letter of credit as "a definite undertaking . . . by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value." WIS. STAT. § 405.102(1)(j).

to pay on the presentation of specified documents showing a default, rather than upon proof of the fact of default. The central distinction between the two instruments, thus, is that the letter of credit creates a primary liability on an original obligation to pay on the presentation of documents whereas the contract of guaranty creates a secondary liability on the pre-existing obligation of another to pay in the event that the other does not. (Citations omitted.)

In the case of a landlord/tenant relationship, the obligation of the issuer to pay the landlord is a primary obligation triggered by the presentation of documents, not secondary to the tenant's obligation to pay rent.[14]

■■

¶ 22. Here, to draw on the standby letters of credit Stanton had to certify that "Tenant is not in compliance with its rental obligations under this Lease." M&I was not secondarily liable for Admanco's nonperformance under the lease—nor was it a surety. We reject Stanton's contention that it meets the definition of a secured creditor under WIS. STAT. § 128.25(1)(e).

B. *The Receiver Is Entitled to Recover the Security Deposit and Proceeds from Letters of Credit Secured by Debtor's Assets.*

¶ 23. Having determined that Stanton is not a secured creditor, we next determine whether the Receiver is entitled to recover the cash security deposit and the proceeds from the letters of credit, to the extent that the amounts exceed the limits set forth in WIS. STAT. § 128.17(2) and deplete estate assets. Stanton

[14] Stanton does not identify a single case that holds that the beneficiary of a letter of credit is a secured creditor.

holds the $61,000 cash security deposit, $375,000 proceeds from one letter of credit and $107,635 in proceeds from a second. We address Stanton's right to retain these amounts.

*1. The Cash Security Deposit*

¶ 24. It is well established that the bankruptcy statutory limit on a landlord's claim applies to cash security deposits. *See Redback Networks, Inc. v. Mayan Networks Corp.*, 306 B.R. 295, 298 (B.A.P. 9th Cir. 2004) (citing *Oldden*). The statutory limit sets the parameters of a landlord's damage claim and, in turn, the amount of the security deposit which exceeds that limit is returnable to the receiver. *See Oldden*, 143 F.2d at 921 (the bankruptcy statute sets a limit on damages for breach of lease by bankruptcy, and the landlord is entitled to only that sum and not more; any surplus security deposit over that amount is returnable to the trustee.); *Mayan Networks*, 306 B.R. at 305 (Klein, J., concurring) (to the extent that a landlord has a security deposit in excess of the amount of his claim . . . the excess comes into the estate); *see also Waldschmit v. Appleton Inv. Co. (In re Zienel Furniture, Inc.)*, 13 B.R. 264, 267 (E.D. Wis. 1981) (security deposit offset against landlord's damages claim, as limited by federal bankruptcy cap on landlord's damages.).

¶ 25. Stanton argues that the analysis of *Oldden* and its progeny is irrelevant because these cases analyzed the application of the statutory limit to a security deposit under the bankruptcy act as amended after 1934. However, *Oldden* specifically noted that, under the pre-1934 limit on a landlord's damages, "the security could be retained only as against possible claims, and the cases assumed that upon complete termination

of the lease upon bankruptcy, any surplus over damages allowable in bankruptcy was returnable to the trustee." *Oldden*, 143 F.2d at 921. In other words, the amount of the tenant's security deposit in excess of the allowable damages in bankruptcy are recoverable by the trustee —under all versions of the bankruptcy act.

¶ 26. Here, Stanton held a $61,000 cash security deposit from Admanco. Stanton has not provided any authority, nor has our independent research identified any, that would support Stanton's argument that it should be entitled to retain the cash security deposit and thus avoid the Wisconsin statutory cap on a landlord's damages.[15] Stanton is entitled to keep that portion of the $61,000 necessary to satisfy its allowed claims against Admanco under WIS. STAT. § 128.17(2), however, any excess belongs to the estate.

## 2. Letters of Credit

¶ 27. Pursuant to the terms of the lease, Stanton held two letters of credit provided by Admanco, to serve as an additional security deposit. Under the lease's

---

[15] Stanton also argues that it is a secured creditor vis-à-vis the cash security deposit. The Receiver counters that the relationship of the landlord to the tenant is that of the debtor. Both parties acknowledge that the security deposit must be returned upon satisfactory completion of the lease term. As set forth above, the authorities are uniform in concluding that the trustee is entitled to recover the amount of a security deposit over and above the landlord's allowable claim in bankruptcy. Stanton provides no case holding to the contrary. Because we find that the security deposit in excess of the allowable claim in bankruptcy is recoverable, we need not address Stanton's secured creditor argument. *See Gross*, 227 Wis. at 300 (only dispositive issues need be addressed).

"Security Deposit" provision, Admanco provided an irrevocable standby letter of credit from a national banking institution "representing security for the performance by Tenant of its rental obligations and certain of Tenant's other obligations hereunder." In turn, under the reimbursement agreement with M&I, Admanco's assets provided collateral for the standby letter of credit and partial collateral for the Bumby letter of credit.[16] At the end of the lease term, upon full compliance, the letters of credit were to automatically terminate or be cancelled by a written statement from Stanton.

¶ 28. Under the "independence principle" discussed above, Stanton contends that the proceeds from the letters of credit are excluded from the receivership because they are not the property of the debtor's estate—they stem from a separate agreement with M&I. In response, the Receiver contends that Stanton does not have the right to retain the letter of credit proceeds, even though they are not property of the estate, because the draws on the letters of credit which exceed the statutory cap depleted estate assets.

¶ 29. As explained below, we agree with the majority of courts that have concluded that the statutory limit on a landlord's claim applies to proceeds from a letter of credit to the extent that the proceeds reflect amounts that were secured with the debtor's assets in the separate reimbursement agreement between the issuer and the debtor. We conclude that this is the better reasoned analysis as it comports with the

---

[16] We reiterate that our discussion as to the Bumby letter of credit is limited to that amount ultimately collateralized with Admanco's assets. The $267,000 portion of the Bumby letter of credit that was, in related agreements, collateralized with the Bumbys' personal assets, is not at issue in this case.

legislature's intent to compensate the landlord up until the date of the receivership petition "while not permitting a claim so large as to prevent other general unsecured creditors from recovering a dividend." *Zienel Furniture*, 13 B.R. at 266. As noted in *Oldden*, the landlord has regained the leased premises (and here, leased them out to other tenants) and the unexpired term of the lease does not benefit the assets of the receivership estate.

¶ 30. *Mayan Networks*, captures the analysis generally accepted in the federal bankruptcy arena. The issue in *Mayan Networks* was whether the letter of credit proceeds were available to the landlord to satisfy its lease claim for future rent without regard to the statutory cap—or outside the statutory cap—or whether the proceeds should be applied to the landlord's capped claim, reducing the claim against the bankruptcy estate. *Mayan Networks*, 306 B.R. at 297–98.

¶ 31. Harkening back to the analysis set forth in *Oldden*, the court first noted that the letter of credit was essentially a security deposit, although a bank was inserted between the landlord and the tenant. *Mayan Networks*, 306 B.R. at 300–01. Despite the separate contractual relationships, where the letter of credit was, through the separate reimbursement agreement between the issuer and the debtor, collateralized by the debtor's property, the proceeds derived from that amount should be deducted from the landlord's capped claim. *See id.* at 301. The court instructed that "the appropriate analysis looks to the impact that the draw upon the letter of credit has on property of the estate." *Id.* at 299. Therefore, "where the [bankruptcy trustee's] claim centers around the *collateral* pledged to the bank and *not* the distribution of the proceeds themselves, 'the

fact that the letters of credit themselves are not property of the estate is a red herring.' " *International Fin. Corp. v. Kaiser Group Int'l, Inc.*, 399 F.3d 558, 566–67 (3d. Cir. 2005) (citing *Mayan Networks*, 306 B.R. at 299).

¶ 32. In *Mayan Networks*, the debtor entered into a sublease of a large commercial building, delivering to the landlord two forms of security for the sublease: cash of $351,033 and a letter of credit for $648,966 issued by a bank. *Mayan Networks*, 306 B.R. at 297. The sublease provided that the letter of credit was delivered "as security for the faithful performance by [Debtor] of all of [Debtor's] obligations under this Sublease." *Id.* The sublease also provided that the letter of credit, or what remained of it, would be returned to the debtor upon expiration of the sublease and the surrender of the property. *Id.* The debtor pledged over $650,000 cash to the bank to secure the letter of credit. *Id.* After the debtor filed a Chapter 11 petition and thereafter moved to reject the sublease, the parties disagreed as to whether the landlord's allowed claim under the 11 U.S.C. § 502(b)(6) cap should be reduced by the amount drawn on the letter of credit. *Mayan Networks*, 306 B.R. at 297. The bankruptcy court determined that it should. *Id.*

¶ 33. The court's decision was upheld on appeal. The appellate court explained:

> If the collateral would come back to the Debtor, but for the existence of the pledge of security, then it is a security deposit for purposes of this analysis.
>
> On the facts of this case, the letter of credit is in the nature of a security deposit. The lease itself described the letter of credit as "security" for the tenant's obligation under the lease. Although the words "security

deposit" are not used, the principles of *Oldden* still apply. From the standpoint of the Debtor's other creditors, the letter of credit has the same effect as a cash security deposit. That is, the amount of money left in the estate to pay unsecured claims is reduced by $650,000 [the amount of the letter of credit].

*Mayan Networks*, 306 BR. at 301. In treating the letter of credit as a security deposit, the court observed that "[t]he bank was fully protected if it had to pay on the letter of credit. Inserting the Bank between the Landlord and the Debtor did not change the true nature of this arrangement, which was to have Debtor provide a security deposit on the lease." *Id.* at 300.

¶ 34. While the court in *Mayan Networks* recognized the difficulty of fitting the three-party letter of credit transaction into the bankruptcy scheme it concluded:

> Letters of credit have yet to find a comfortable place in bankruptcy law. However, it is not necessary to distinguish the letter of credit in this case from the security deposit in *Oldden*. Here, the language of the lease described the letter of credit as security for the lease and the letter of credit was fully secured by a cash deposit. The draw upon the letter of credit had the same effect on the estate as the forfeiture of a cash security deposit . . . . Therefore, the draw upon the letter of credit will be applied in satisfaction of the landlord's claim against the debtor and the amount of such a claim will be reduced by the amount of the draw.

*Mayan Networks*, 306 B.R. at 301; *see also In re Connectix Corp.*, 372 B.R. 488, 495 (Bank. N.D. Cal 2007) (recognizing that the landlord's allowed claim under the statutory cap applied to post-petition draws on a letter of credit security deposit; "a letter of credit was intended to be and should be treated as a security

255

deposit because draws against the letter of credit would have an effect on the property in the debtor's estate"); *AMB Property, L.P. v. Official Creditors (In re AB Liquidating Corp.)*, 416 F.3d 961, 962, 965 (9th Cir. 2005) (upholding reduction of landlord's allowed claim by the amount of the security deposit which was in the form of a fully collateralized letter of credit); *International Fin. Corp.*, 399 F.3d at 566 (while the letter of credit itself and the payments thereunder may not be property of the debtor, the collateral pledged as security interest for the letter of credit is); *Solow v. PPI Enters., Inc.*, 324 F.3d 197, 210 (3d Cir. 2003) (finding that the parties intended to treat letter of credit as a security deposit and affirming the Bankruptcy Court's application of the statutory cap to the proceeds); *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586, 589, 590 (5th Cir. 1987); *see also First Avenue West Building, L.L.C. v. James (In re Onecast Media, Inc.)*, 439 F.3d 558 (9th Cir. 2006) (trustee entitled to recover portion of cash security deposit and letter of credit proceeds that exceeded the landlord's damages arising out the trustee's rejection of the lease); 9A AM. JUR. 2d *Bankruptcy* § 1316, Observation ("Collateral which has been pledged by a debtor to secure a bank's claim against the debtor for indemnification after a letter of credit securing an obligation incurred by the debtor has been honored by the bank constitutes property of the debtor's estate."); *see also* 2 Bankruptcy Desk Guide § 12:84 (March 2009).[17]

---

[17] While we follow the more widely accepted view regarding letters of credit, we acknowledge Stanton's position that some early cases conclude that letters of credit arranged for by a debtor-obligor, and the proceeds thereof, are not property of the debtor's bankruptcy estate because the payment to the beneficiary of the letter of credit comes from the assets of the issuer,

¶ 35. The circuit court's reasoning in this case reflects the majority rule that a standby letter of credit does not nullify the statutory limit on a landlord's damages.[18] Whether in the form of cash or proceeds

not the assets of the debtor. *See In re Ocana*, 151 B.R. 670, 672 (S.D.N.Y. 1993); *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*, 162 B.R. 935, 942 (Bankr. S.D.N.Y. 1994). However, certain cases cited do not bear out Stanton's position. For example, *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586, 589, 590 (5th Cir. 1987), states: "It is well established that a letter of credit and the proceeds therefrom are not property of the debtor's estate," but the court goes on to recognize that "[c]ollateral which has been pledged by a debtor as security for a letter of credit *is* property of the debtor's estate. (Emphasis added.)

Certain other cases cited by Stanton do not address the issue at hand: *P.A. Bergner & Co. v. Bank One*, 140 F.3d 1111, 1118, 1119 (7th Cir. 1998) (recognizing the independence principle in determining whether payments from a debtor to the issuer of a letter of credit were voidable preferences under 11 U.S.C. § 547(b)); *In re Delaware River Stevedores, Inc.*, 129 B.R. 38 (Bankr. E.D. Pa. 1991) (addressing whether an automatic stay under 11 U.S.C. § 105(a) applies to an attempt to draw on a letter of credit). Finally in *Musika v. Arbutus Shopping Center, Ltd. (In re Farm Fresh Supermarkets of Maryland, Inc.)*, 257 B.R. 770 (Bankr. D. Md. 2001), the facts did not reveal whether the letter of credit was secured by the debtor's assets and the issue was not otherwise raised or addressed. In the end, we agree that, if the reimbursement agreement was not collateralized with the debtor's assets, the analysis should be inapplicable because it does not defeat the purpose of the limit, which is to fairly distribute the debtor's assets to its creditors.

[18] The doctrine of independence protects only the distribution of the proceeds of the letter of credit. Here, the Receiver does not challenge the initial payment of the proceeds of the letters of credit to Stanton. Rather, it seeks recovery of the proceeds because they deplete estate assets and exceed the statutory limit. Once the proceeds of a letter of credit have been

from the draw down on a letter of credit that was secured by the tenant's assets in the reimbursement agreement, the debtor's security deposit/assets obtained by the landlord in excess of the allowable damages in a bankruptcy are recoverable by the trustee. We agree with the circuit court that the federal law provides proper guidance in our interpretation of WIS. STAT. § 128.17(2). The federal cases stem back to *Oldden*'s observation that under the pre-1934 act (upon which WIS. STAT. ch. 128 is modeled), the debtor's security deposit was returned to the estate, to the extent it exceeded the allowed claim in bankruptcy.[19] Applying § 128.17(2), the circuit court reasoned that the letters of credit were essentially a security deposit under the lease and thus, to the extent the letters of credit were in turn collateralized with Admanco's assets, the statutory limitations on the estate's liability govern the landlord's recovery. We agree.

■■■

¶ 36. At the time Stanton drew down the letters of credit, Admanco had entered into receivership under WIS. STAT. ch. 128. The lease clearly provided that the

---

drawn down, the statutory landlord limit becomes pertinent in determining which parties have a right to those proceeds. *See Two Trees v. Builders Transp., Inc. (In re Builders Transport, Inc.)*, 471 F.3d 1178, 1186 (11th Cir. 2006).

[19] Stanton cites to *EOP-Colonnade Ltd. v. Faulkner (In re Stonebridge Technologies, Inc.)*, 430 F.3d 260 (5th Cir. 2005), in support of its cursory argument that the courts have not previously required the disgorgement of amounts paid to the landlord under a letter of credit. However, the Receiver correctly points out that the court's decision against ordering the return of excess proceeds to the trustee hinged on the landlord's failure to file a proof of claim in the bankruptcy proceeding. *See id.* at 274. Here, Stanton did file a proof of claim. Therefore, the result in *EOP-Colonnade* does not extend to this case.

standby letters of credit were to serve as a security deposit by "representing security for the performance by Tenant of its rental obligations and certain of Tenant's other obligations hereunder." Upon completion of the lease, the security deposit was to be returned and the letters of credit would automatically terminate. We conclude that the letters of credit at issue in this case are in the nature of a security deposit, and as such, the proceeds are governed by WIS. STAT. § 128.17(2). This approach recognizes the reality that a letter of credit with a related reimbursement agreement secured by the debtor's assets could overwhelm the estate to the detriment of other creditors and faithfully implements the limit on a landlord's claim set forth in ch. 128.[20]

## CONCLUSION

¶ 37. We conclude that Stanton's claims are limited under WIS. STAT. § 128.17(2). We further conclude that the proceeds from the letters of credit, to the

[20] We acknowledge Stanton's contention that this is a harsh result, particularly given that its lease with Admanco was part of a sale/leaseback whereby Stanton provided Admanco with $2.5 million in cash. While Stanton argues that it would have fared better under the federal bankruptcy law, particularly the 11 U.S.C. § 502(b)(6)(A) cap, it also acknowledges that the federal cap does not apply. This is not the first time that the inadequacy of our state receivership law has been questioned. *See Capitol Indem. Corp. v. Hoppe (In re Bossell, Van Vechten & Chapman)*, 30 Wis. 2d 20, 26–27, 29, 139 N.W.2d 639 (1966) (noting that the state did not adopt the amendments to the Bankruptcy Act of 1898 and "the inadequacy of our insolvency law" in comparison with federal law). However, we are bound by the language of the statute. *See Midwest Mut. Ins. Co. v. Nicolazzi*, 138 Wis. 2d 192, 201, 405 N.W.2d 732 (Ct. App. 1987) (It is not our function "to rewrite the statute or to bend it to our will if we feel its application is too harsh.").

extent the related reimbursement agreements were collateralized with Admanco's assets, are essentially a security deposit under the terms of the lease and are recoverable by the Receiver. We further conclude that Admanco did not reject its lease with Stanton when it filed for receivership under WIS. STAT. ch. 128. We uphold the circuit court's grant of summary judgment in favor of the Receiver and its judgment in favor of the Receiver in the amount of $513,292.66 plus statutory costs and fees.

*By the Court.*—Judgment affirmed.